Good morning. May it please the court. My name is Eitan Casteljanich. I am representing Steve Edgecomb in this appeal. Edgecomb has been in several motor vehicle accidents which injured his cervical spine and his lumbar spine. He had surgery on the cervical spine in March 2004 but never fully recovered and has been experiencing severe pain as well as postural and manipulative limitations for many years. Edgecomb has attempted to return to work several times and he in fact worked largely part-time between 2009-2011, quite a bit. But by November 2011 he couldn't keep it up and he was unable to continue working. After he stopped working in November 2011 he went to the doctor and he actually went to a nurse practitioner, Nancy Armstrong. She had a cervical spine MRI done and the cervical spine MRI showed that there had been progression in his cervical spine. The MRI showed that there was neuroforaminal stenosis that may be compressing on exiting nerve roots, which was likely compressing nerve roots at C4-5 and C6-7. This is the most recent record. It's dated three months before the hearing but the ALJ failed to discuss this evidence. That's the big error here. That's the elephant. It's the obvious error. When there's new evidence like that, that's in front of the ALJ and the ALJ simply disregards it without comment, that violates the legal standard that this court, well, it's gone for years from this court. Pardon me for interrupting but I'll just tell you what my problem is in this case. I'm on pages 11 and 12 of the ALJ's opinion and the ALJ gives repeated instances of, he claims a certain level of disability. He can't bend more than 50 degrees but then he puts his shoes on easily. He complains that he doesn't walk very well but then he walks out to the parking lot and he's walking great. I mean, this is sort of, this is almost paradigmatic. The insurance company films the guy playing golf. I mean, what do you make of this? That we've got not just one but several reports where the doctors say, after I've examined him and he's now just kind of acting on his own, he looks a lot better than when he was reporting his symptoms to me. What do we do with that? Because that strikes me as an ample basis for an adverse credibility finding. I'm not discussing, first of all, most of the evidence that you're just talking about, this case, his injuries date back to 2004. He did not apply for benefits until, I believe, 2009. He'd applied in 2007 as well but I think the issue with regard to what you're describing is that his pain fluctuates quite a bit. For example, there's... Between the time he's being examined and the time he walks out of the office. Yes, even between that because, for example, there's instances... There is one thing that you have to add to what Judge Fletcher just asked you. He does allege disability from 2004 through EOI March 2012. That is true. So all of those facts are relevant. Well, we're talking once again... Don't disparage them just by saying, well, they're not relevant because he is alleging disability from 2004. Exactly. And I was hearing your answer and I was saying to you, how can you get there? Okay. Well, over a course of eight years, his condition has fluctuated considerably. He approved enough to where by 2009, he decided to go back to work to try to find jobs he could do. And he worked several different jobs and the third job that he did actually reached the level of substantial gainful activity for about six months. So we're not actually asking you to find him disabled since 2004. That would not be reasonable. And I agree with you that there were time periods where his functionality fluctuated enough that you just can't... It's harder to know exactly what's going on. But I should also add that this file is missing evidence from 2004 to 2000. And this file is not complete because the ALJ, although we had earlier applications for benefits, the ALJ never obtained those files. So we don't have that evidence. I can't fully address what's not in front of me. It's not in front of this ALJ. What I'm talking about, when I point to 2011, the significance of that, there's no evidence that since November 2011 that he could do anything more than sedentary work. There's no evidence that since November of 2011 that he could function in any type of full-time work. There were several psychiatric and psychological evaluations in the file. There were two evaluators and there was one person who was just a non-examining person. All of them concluded he was limited to simple work. He's been on narcotic medication for a decade. I mean, he's been on it for a long time. There's evidence in the file of a failed epidural steroid injection that occurred, I believe it was in 2005, that went wrong and it almost paralyzed his arm for about six months. So it's been a long-standing thing. But once again, application's not until 2009 and I'm not trying to prove disability 2004. I can't do that on this record and I'm not... You've said that. So could you move on and discuss the rejection of Dr. Ho and the inconsistencies with Dr. Grissom and then Dr. Hurley, who seemed to agree with Dr. Ho about certain limitations? Well, I agree. The big issues here, I point to Ms. Armstrong first because the ALJ rejected her opinion because supposedly she didn't cite any objective evidence to support her opinion when in fact she'd obtained an MRI, saw the MRI, cited the MRI, attached it to her evaluation. But the ALJ said, I reject her opinion because she doesn't cite any objective findings. She also did detailed range of motion studies. Range of motion studies are objective evidence by a knowledgeable person. Well, she did say additional reason that her testimony conflicted with that of Dr. Hurley. Right. Okay. I'm going to jump back then to Dr. Ho because you're talking about Dr. Ho now. Okay. Well, and maybe in respect to the question because I was going to ask a similar question, Dr. Ho examined in August of 2007. Dr. Gierssen, who is a treating physician, then comes to the party in September 2007 and one cannot say Dr. Ho and Dr. Gierssen agree. Then Dr. Hurley comes to the party in 2009. The ALJ doesn't agree with everything Hurley says but does give some weight consistent to the record as a whole of the time evaluated, so replying back to Gierssen. And then Dr. Garrison comes in March of 2011. And what the ALJ really does is the ALJ says, Dr. Gierssen is the treater. He is the basis. I'm going to throw out Ho because he doesn't agree. I'm going to throw out Hurley to the extent he doesn't agree. And then Dr. Garrison comes around in March of 2011 and says, I agree with Gierssen. I want you to talk about his question, but I don't want you to leave out that we have a grammatical record here as to Ho did what when. OK. So Dr. Ho, back to August of 2007, detailed many clinical findings, objective clinical findings that supported her opinion. And she concluded that he could only stand or walk for two hours in an eight hour workout. And she concluded that he could only stand or walk for two hours in an eight hour workout based on her objective findings. Shortly after that, it wasn't that long after that, that Dr. Gierssen mentioned that he is walking. He's walking as much as three miles a day. And the ALJ said. And not only did he say walking three miles a day, he also said he is functional. He does well on chronic pain meds. He walks up to three miles a day. All he wants are the meds and a parking card. Right. But the point. That's a little bit different than Ho. OK. It is different, but there is not a conflict between being able to walk a total of three miles in a day and being able to walk for two hours in a day. Because even a person walking with a cane can manage those three miles in two hours. The other thing about the cane is everyone who sits with his dogs. It's a small dog. But everyone who it is, I've met it. I mean, all I'm trying to say is I go out walking. I don't have a dog. But to me, there's a total difference in he can walk two hours in an eight hour day and sit for a total of six hours. And he's been doing well on chronic pain. He's functional. He's even able to walk three miles a day with his dog. Well, I don't know. I think doing well on pain medication tells us that, I mean, honestly, it did help him enough to where by 2009, he returned to work. We're not disputing that. It helped him. If it didn't help him, he wouldn't have been able to walk for three miles a day. And you're saying we don't really need to rely on Dr. Ho at all. Because Dr. Ho is in conflict with Dr. Grierson. And Dr. Grierson turns out to be right. Because in 2009, he's back to gainful activity. Is that what you're saying? Essentially, yes. But in 2011, his neck worsened to the point where he couldn't work. And it's well- What are you going to do with Dr. Garrison? Pardon me? Garrison. Excuse me. Dr. Grierson did not- Not Grierson. Now we have Dr. Garrison. Okay, I'm sorry. I know there's a problem because every time I argue with my law clerk about this, we got confused about those two. But Dr. Garrison examined in March of 2011 and agrees with Grierson. At the time that Dr. Garrison evaluated him, he was working full-time at SGA levels. So it's no surprise that she didn't find that he was doing that badly then. Eight months later is when the MRI came out that showed that he had gotten worse. It supported why his symptoms were worse. And as the evidence in this record shows, just three weeks after the ALJ's decision, he finally got to a neurosurgery and he said, you need another round of neurosurgery on your neck. So once again, I'm not disputing, I don't have to dispute Dr. Garrison's opinion. He was working then. But from November of 2011 on, he was not working. And his neck was so impaired that he couldn't work. But here's my problem if we're talking about subsequently to November 2011. I'm just reading from the ALJ's report. January 2012 performance-based functional capacity evaluation report indicated a considerable question about the reliability and accuracy of his reports. Report noted that he limped and dragged his right foot on a walking test. His gait was different from formerly tested versus what he was walking to and from his vehicle. So in 2012, the tester says, you know what, he's not telling me the truth and he's faking his symptoms. Actually, the testers, even though they saw that, even based on what they saw, concluded that he will need to be able to change positions frequently in order to be able to negotiate his symptoms. They concluded that he was limited to sedentary to sedentary light work. Those were their conclusions. They also found that there were some of the tests they administered, he couldn't perform because he was afraid it was going to hurt him too badly. And that's consistent with the fact that two months later, three months later, the neurosurgeon said, yeah, you need neurosurgery on your neck. So the fact that he was self-limiting does not mean that he was not being honest with them about his limitations. He's limping during the test and he's walking normally when he goes out to his car. His main problem is his neck, not his lower back, but they both affect him. Okay? And his use of his cane throughout the record is variable. Sometimes he needs it and sometimes he doesn't. His ability to walk varies depending on the position of his back and how he's doing that day.  Why don't we hear from the government and you've got a little time for a rebuttal. Thank you. Good morning, your honors. I'm Tom Elsberry for the Commissioner of Social Security. And I'd like to start out by asking what questions you'd like to ask the government first. Well, I'd like to, counsel has emphasized an objective medical test, which is the MRI and having gone through that process myself over the last year, I can appreciate its usage in a diagnostic. And so if the ALJ had that MRI report in front of him, why didn't he talk about it? The 2011? Yes. I do not know the answer to that. I do know that, I'm starting to remember the gender. I do know that he talked about the 2006 and the 2007 MRIs and that the 2011 was not materially different. And that he spoke of Nurse Armstrong's report, which had the 2011 MRI attached to it. Why he didn't mention it, I'm at a complete loss. But is that harmful? I believe is the true question and it's not harmful because the 2011 MRI was not materially different from the 2006 and 2007. And there are no functional limitations within an MRI. So, and the MRI is discussing his cervical spine issues, which the ALJ found to be a severe impairment and there's no dispute there. So there is no other purpose for the 2011 MRI, there's no other purpose for that MRI that would be harmful by omitting its existence. It's, I think Edgecombe has not shown any harm in his failure to mention that report. As I said, no functional limitations are mentioned, it's materially the same as MRIs the ALJ did look at. And its main purpose would be to, would be diagnostic. And he did discuss the report to which the MRI was attached. Exactly. I would hope this is not the case, perhaps he found it redundant and duplicative. But nonetheless, I would expect the ALJ to have mentioned it. But the reason we argue it's not error is because there are no, there is no other purpose that it conserved that would affect the ALJ's decision. He clearly considered cervical limitations or the indications of cervical impairment and found it to be true. Yes, it's one of the severe impairments. I guess the problem comes, I'm especially surprised by counsel's argument to your opposition which says, well don't worry too much about all this other stuff after he went back to work. It's only after he got through work, went back to work that you have to really look at this case. So the arguments about Dr. Ho or Dr. Hurley or all of those are kind of thrown out the window it seems. We're really looking at this one report. So if that's your answer, I guess that's the basis on which we make this case. Well then, permit me to expand a little bit more. Before you. I thought you better. Before you leave, where did, I'm looking at the ALJ's opinion on Armstrong. Where did you say that the ALJ found that the MRI, the 2011 MRI was not materially different? The ALJ doesn't say that. That's our argument in defending the ALJ's decision. He doesn't mention the 2011 MRI at all. There's no mention of the MRI. Yeah, because he accords her opinion, little weight, and yet the MRI is attached to it, so. But he. But the reason he accords it little weight is. It's inconsistent with one, acceptable medical source evaluation at the same time. And an MRI doesn't contain functional limitations, so that can't provide support for Nurse Armstrong's assessment of limitation. Yeah, all right. So to the issue of post substantial gainful activity, which he ceased in September 25th or 26th 2011. Yes. He was terminated. It wasn't due to disability issues. Approximately six weeks later, he has the 2011 MRI, which as I said before is consistent with the other MRIs, after which he was able to go through nearly a full two years of substantial gainful activity. There's nothing in the record that shows a marked increase or severity of his cervical spine between September 26th and November 11th when the actual MRI was conducted. So. You said that after the November 11th, he then engaged in further gainful activity? No, that his. That's what I thought you said. I said, no, I'm sorry, that his gainful activity. That's not in my record. No, nor mine. No, that his gainful activity ceased just six weeks prior to the. Right. Okay. I understand that. And we have, I'm sorry, a 2012 evaluation as well, which then should address that, which is. Actually, excuse me one second here. There's a 2012 in the record? Yeah, no, I'm sorry, I haven't spoke. That, we do, it's from Dr. DePinto, but it's not an evaluation. It was a note that Dr. DePinto drafted on behalf of claimant's request. So. Can I ask you, what was Dr. Grusin examining or treating him for? The treatment notes talks about sinusitis. Was he looking at the capacity to work? I don't recall. I'm sorry. I do not recall. And yet, ALJ uses that to reject Ho. I have his report right here. See, my problem, just to put it in context, is ALJ goes from Ho to Grusin, and then he invokes Dr. Hurley. Now, Hurley gave a, did a checklist. But in that checklist, he agrees with Dr. Ho's lifting and those kinds of restrictions. And yet, he gives Hurley some weight, and he gives Ho little weight. And he never explains, ALJ doesn't explain, well, why didn't he note that Hurley, in fact, does support in his checklist what Ho was finding as well. Well, Dr. They are, as I understand it, both looking at capacity to work. So, Grusin is talking about sinusitis and something else. And, but Grusin finds him capable of doing light work, and Dr. Ho finds him capable of sedentary or less than sedentary. Was he examining him for that in relation to his physical condition? I believe I have the report right here. One of the downvotes of the electronic record. Well, the question that the good judge is asking you is pretty important, because it looks like he went in there for his sinus. But then, when you look at his report, you get down to diagnosis, and he goes about, he goes talking about cervical radiculopathy. And then goes on to write the rest of this note, which we have referenced. And I'm sorry, I believe it's sufficient that the findings are different, and that the ALJ discussed those differences. Well, they're based on a scientific or medical examination. But I was troubled by the notion he went in for some diagnosis that was unrelated to his capacity to work, even though there's comments about it. Now, why was he looking at that? I'm sorry. I'm sorry. I could delve into that. There are so many doctors and other sources raised by Edgecone. I know that. That's the problem with these cases. We're sitting here at the 11th inning. I think we have over ten sources in this case. Okay. Counselor, he does remark that he did request a disabled parking card that day. Yes, he did. And I do recall this. And I believe he sounds like he even obtained it. But in doing so, the doctor noted he's not disabled all the time. It comes from when he sits in his car for a long period of time. He might need it for that. Excuse me. Are there any other questions? None from me, thank you. Any questions from the bench? Okay. I guess my closing would be to say I'm sorry that I can't recall the specific purpose for his visit to Dr. Pearson. But I think nonetheless, the standard of review has been satisfied by the LJ. Substantial evidence supports his decision. And it's free of legal error. He gave his reasons for accepting one and not accepting the other. Thank you very much. Thank you. Now you've saved a little time. First of all, with regard to Ms. Armstrong, the ALJ did discuss her opinion but did not, because he didn't mention the MRI, his statement that her opinion was not supported by examination findings or other objective evidence is false. His reason for rejecting her opinion is false. It's false. It's not true. And that's with regard to November 2011. What about the government's argument that it doesn't make any difference because it's not much different from the MRIs the ALJ had already referenced and spoken about? If that were true, that's a good argument for harmless error. But it's not true. It does show significant difference, which is why he was referred to a neurosurgeon, who then said he should have neurosurgery. So it's not the same. Read the two. They're not the same. They're not even close. How do we know that? Well, you know, it's funny. I'm not a doctor. None of us are. We're law doctors. But you can compare them in the file. The previous ones do not discuss contacting the nerve roots, that the stenosis was contacting the nerve roots. And that's the kind of thing that can result in paralysis, ultimately, which is why they do surgery to stop that, so that you don't damage the nerves. And so they're not the same. But the ALJ didn't discuss it, didn't mention it. And all we've got is the government saying they're the same. Well, they're not the same. Back to Dr. Hurley, who was just a non-examiner. Dr. Hurley did say that he accepted what Dr. Ho said and said he was limited to sedentary work, could only stand for two hours, said the evidence supported that. That's what Dr. Ho said. But really, you've waived that argument. What's that? When you answered your questions to me, you waived that argument. You said it doesn't matter. We went back to work, just like Dr. Gerrierson said he was going to. So the only thing you've got to really worry about is this last MRI, which nobody mentioned. Okay. Well, Dr. Gerrierson didn't say he could go back to work. He said he needed a disability parking pass. He said he needed to use a cane at times. The ALJ used those comments about how you're doing, I'm doing pretty good, used those comments to impeach Dr. Ho's opinion about his limitations. Dr. Gerrierson didn't state an opinion about his physical limitations. But what complicates this is a few years later, despite having to use a cane and a service dog, he went back to work, and he worked for two and a half years, only about six to eight months for substantial gainful activity. But I can't dispute Dr. Gerrierson's evaluation because he was doing better at the time he was working. She opined that that was her opinion. How do you dispute that? I really can't. So what does complicate this is between about 2007 and 2009, when he wasn't well enough to even go do part-time work, it looks like he's disabled. And what do you do from 2009 to 2011? He applies for benefits while he goes back to work, does the best he can, and when he falls apart, gets this MRI, shows he's disabled, and the ALJ doesn't even mention it. So that's what we're left with. At the administrative hearing, I argued that was trial work. But, you know, once again, I understand. Okay. Thank you very much. Thank you. The case of Edgecombe v. Colvin submitted for decision, and that's the conclusion of our arguments for today.
judges: W. Fletcher, Fisher, N.R. Smith